Thank you. May it please the court and counsel, on December 6th of 2012, the Idaho State Police conducted a walled-off traffic stop of my client, Mr. Monte Hoffman, to further law enforcement's general criminal investigation concerning a house located in Pocatello, Idaho at 710 Jefferson. And today I'm here to ask this court to reverse the district's court's decision and suppress all evidence that was gained from that stop. This is because Trooper Edgeley, who conducted the stop for the Idaho State Police, lacked reasonable suspicion warranting each of the prolongations of that traffic stop. And in addition, and that was the calls for the drug dog as well as the probation check and the prior drug conviction check that he had conducted. In addition- Could you just walk me through what the various timeframes were, especially at the beginning? I did watch the video several times, but it's a little bit indistinct. And it wasn't clear whether Mr. Edgeley was doing, what sort of check he was doing when he got back into his vehicle. Because in, Rodriguez says it's okay to do a record check. I think we've said that as well, but you can't do a felony check. So what was he doing at that point? So he walks up, he stops him, he walks up, he tells them that he erred in driving over a double line. And that's uncontested, right? You're not challenging the stop itself? You're on, Judge Christian, you're correct. Okay. So then- There's no dispute that Trooper Edgeley did have reasonable suspicion independent of what was observed at 710 Jefferson to pull him over for a minor traffic violation. Okay. So then back to Judge Ikuda's question. I'm just trying to take it from the top. Yes. Could you go back to her question? So, Judge Ikuda, the issue here, the prolongations that are at issue are, upon approaching Mr. Hoppen, Trooper Edgeley advises him the basis for the stop, and then he's going to release him. He says, I'm not going to cite you, but by that time he already has the registration, as I saw the video, he already has registration in his hand. So he sees that the truck is not registered to him, and he sees that the address that he has is not the place as he's currently living. That's correct. And after returning to his cruiser, Trooper Edgeley then calls in a registration check, but also calls in for a drug dog, which under the Rodriguez and this Court's Evans decision, he was not allowed to do absent reasonable suspicion. So at that point, he knows that Mr. Hoppen was spotted at a house that suspected of drug activity. He knows that the truck he's driving isn't registered to him. He made some answers, Mr. Hoppen made some answers, which Mr. Edgeley deemed to be evasive, such as when he asked him, where are you coming from? He said, well, I live in Idaho Falls. And when he asked him, where do you live now? He couldn't give an address or even an apartment number. And then he also said some things about he seemed nervous and agitated, which I couldn't tell from the video. So is that enough, putting those together? Why aren't those enough to give rise to reasonable suspicion that would justify looking into other issues? Well, to appreciate this case, I think we need to take a step back in time. And this case occurred before the Rodriguez and Evans decisions were released. Under the Illinois versus Cabala's case, the court had said that running the drug dog around a car during otherwise lawful search is permitted. And what happened was there was a line of cases saying that we're not going to look at what was done during the stop, but we're going to look at the aggregate amount of time the stop took. And so what happened is law enforcement became less focused on reasonable suspicion and more focused on whether they were expeditiously completing the stop. But that's not the rule now, right? Because Justice Ginsburg says you don't get bonus points for working fast. Exactly. And so under the Rodriguez and the Evans decisions, it's bring back law enforcement said, no, if you're going to do these tasks that are unrelated to the traffic mission, you need to have reasonable suspicion for those tasks. At this first juncture, the first prolongation, why was it insufficient? Well, I think if you look at the, let me back up, Your Honor. Beto Couto has just explained at that point, the officer knew he'd been spotted at the house, right? He had trouble giving a local address. It looked a bit of an evasive answer. Why is this not enough? Well, you can have... Counsel, why isn't the credibility of the two detectives involved relevant as well in terms of their experience and doesn't that inform what they knew at the time that Judge Couto is talking about? I don't believe the officer's credibility is at issue or a question at all. We have, I mean, you can have, reasonable suspicion can be based on a set of innocent factors which in and of themselves do not give rise to... Counsel, forgive me for interrupting, but you only have four minutes left. So, why is this not enough, please? What you have here is a series of innocent factors. You don't have any concrete reasons to give rise... These just come from a suspected drug house where another officer had, right, even participated in a controlled buy. Why isn't that enough? Does anyone that goes to the 710 Jefferson house and leaves, do they leave... We're looking at all of it and I'm really just trying to give you a fair chance to respond to the question, but we're looking at all of it. He's come from a drug house, he's, at this point, he hasn't yet denied coming from the drug house, but he's not able to give a local address. The registration is to a different name. He seems agitated. Why is it not enough? Is there another case we can look to where comparable facts have been found to be lacking or what is it in particular? Well, yes, Your Honor, you can look at both the, let me back up, the Eighth Circuit United States v. Beck decision as well as the United, this circuit's court decision in U.S. v. Thomas where the court said the sum of zeros, where you have a series of innocent factors with no concrete reasons tying those factors together does not give rise to reasonable suspicion. Okay, so that's your thesis, that that was what we have here, the sum of zeros, none of them, nor cumulatively. We have a series of hunches that my client was involved in drugs, but no concrete reasons tying him to specific drug activity at the 710 Jefferson house other than he was observed going in and out. Okay. Do you want to go to the next sequence in the timeline? Well, yes, Your Honor, and I'd like to move on to the next issue too, which is the other issue that's at play here is the Trooper Edgeley, many minutes, I believe it was 18 minutes into the traffic stop, decided that he was going to conduct a tariff risk on my client. And it's our position that at that point, that attenuated time into the stop, he didn't have a reasonable suspicion, one, to conduct tariff risk because it was not necessary for officer safety. He didn't have a reasonable fear that my client was armed and dangerous at that point. What about the fact that the defendant apparently was observed reaching into his pocket several times? Well, I believe that was after he was asked to exit the vehicle and submit to the tariff risk. What happened... And I'm... Excuse me, I may be unfamiliar with that instance in the record. The second argument is that once the tariff risk was conducted, the purpose was not necessarily to search for possible weapons, but Trooper Edgeley's concern was to determine exactly what every object was in my client's pockets. Is it your argument that he continued to search after he had satisfied himself there were not weapons? Exactly. So what is the place in the transcript? Again, I'm looking at the time for you. What's the place in the record where you think that risk needed to stop, please? Well, if you look at the record at... I believe it's... Excuse me. Excerpts of record page 108 and lines 12 through 14. And this is Trooper Edgeley's words. He says, if he doesn't know what's in his pockets and I don't know what's in his pockets, and I can't clearly say that that's not a weapon, then I'm going to check and find out. That's not the standard under the Minnesota v. Dickerson or this Court's IAV decision. You can't... The officer, unless the incriminating nature of an object is readily apparent, the officer can't continue to manipulate the pockets to determine what that object is. So once you conduct the initial pat-down, if you don't... that there's an object that might be a weapon, then that's the end of the inquiry. And that's where Trooper Edgeley erred. We took over your time, but we'll give you a minute for rebuttal. Thank you. We'll hear from the government. May it please the Court. Counsel, my name is David Robbins, and I have the privilege of representing the United States in this matter. The first question called upon by this Court to be answered is, at the time Trooper Edgeley called in the K-9 check, the records check, was that action supported by reasonable suspicion? The answer to that question is yes. Your Honor, you asked about the time frame. Approximately that first initial contact between Trooper Edgeley and the defendant took 3 minutes and 26 seconds. Let me ask you about that initial contact. So very quickly into the contact, Mr. Edgeley says, I'm not going to cite you. Now, according to Rodriguez, that's the end of his mission. The only other thing would be to make sure that the car is registered and has insurance, which he does. So it seems like at that point, anything that happens after that point has to be based on reasonable suspicion. And the only thing I didn't see very much, it seemed very, very thin as to what he had. He was seen at a drug house, and giving him the benefit of the doubt that he saw that the registration was registered to someone else, is that enough for reasonable suspicion to then detain him after he's already decided I'm not going to give you a ticket, which is the mission? Yes, Your Honor. In Rodriguez, it was held by Justice Ginsburg that beyond determining whether to issue a traffic ticket, an officer's mission includes verifying that the car is lawfully registered, the presence of insurance, and other things of that nature. But there's no allegation it wasn't lawfully registered. It was registered to somebody else, right? That is correct, Your Honor. So what's the problem? The problem with that is if you look to excerpts of Record Volume No. 2, you had expert testimony on pages 61, 62, that drug and narcotics traffickers typically use vehicles not registered to themselves to avoid detection. Right. But so lots of people drive cars that aren't registered to themselves also. So you've got that point, that it was registered to someone else, which is consistent but certainly very minimal. There's testimony that Mr. Hoffman was nervous or belligerent. It certainly doesn't show on the videotape. He says, so why are you – what did I do wrong? Oh, darn. You know, certainly there's no signs visible on the videotape. And he didn't know his apartment number or his address. So those are very, very minor sorts of things. So explain to me why that adds up to a reasonable suspicion that would allow for a sustained detention or stop. It is the totality of circumstances, Your Honor. Right. What other circumstances have I missed? The drug house, the registration, and he didn't know his address. He also was evasive in his responses. Well, so the evasiveness was the police officer said, where are you coming from or where did you come from? He says, well, I come from Idaho Falls. It's hard for me to see why that's evasive. There was no follow-up question. It's like, no, I meant the drug house that you just came from. There was no follow-up question. So I think that was a reasonable response to, where are you coming from? I live in Idaho Falls. I would state that the response, the trooper has been a trooper since 2007. And when he asked that question, it struck him as evasive. And I do cite to the transcript of record, page 65 on volume 2, saying that typically in response to that question, he would have expected, I'm coming from a house, a grocery store, to respond ultimately where you're from. He found odd. But Your Honor is correct. That standing alone is not reasonable suspicion. It's the totality of the circumstances. To return back to your original question, Your Honor, you asked what else? There was moderate aggression at the initiation and outset, and that's in volume, that's at 83, but then it was the nerves. And what conduct are you specifically referring to? In terms of the moderate aggression? Mm-hmm. When the officer approached the vehicle, and this is approximately a minute into it, instead of saying, he said, why did you stop me? You know, it was essentially a confrontational cone as opposed to, I'm sorry, sir, what seems to be the problem. I think that is the basis for the officer's conclusion that he was moderately aggressive. His aggression obviously creased way more in the video, but there was also the issue of nerves, Your Honor. Now, nerves alone are not sufficient for reasonable suspicion, and I do not submit that to the court. However, the officer, when he told him, I'm not going to cite you, his nerves did not abate. His nerves maintained, and that he noticed as being suspicious. So when counsel tries to draw parallels to United States v. Beck out of the Eighth Circuit, this case is a little bit different, especially on the issue of nerves. But in totality of the circumstances, Your Honor, leaving a drug house, not knowing where he lives, minor evasion to the question, nerves you would have expected to abate, and also driving a truck registered to somebody else, the government respectfully submits that that is reasonable suspicion based on specific articulable facts. Reasonable to do what? What's the next step that he took? United States v. Sharp. Well, the next step he took to answer your question directly, Your Honors, he went back to his vehicle, and he called for a K-9. He pretty much instantly found out that no K-9s were available, and this is why dispatch was running in the background to him. This takes another minute and a half, two minutes? In terms of take – Sorry, go ahead. The record is unclear because it seems that multiple searches were going on at the same time. Right. So you have dispatch looking up records, and then he's making phone calls simultaneously. So he was also checking, getting a – not a record check on the vehicle to see if there were outstanding warrants, but checking for felony conviction. So does this nervousness, evasion, whatever it is, give rise to a reasonable articulable suspicion that the driver is a felon or has a felony conviction? Not necessarily that he's a felon, but the officer is working diligently to either confirm or dispel his reasonable suspicion, which he's empowered to do. And a person's criminal record may be of marginal relevance, but, of course, if somebody's been convicted of drug trafficking 10 times in the past or have a clean record, either confirms or dispels that reasonable suspicion, which may inform the officer's next actions of whether or not to prolong the stop or to actually seek out a drug dog and the like, Your Honor. So basically anyone who sees a person leave a suspected drug house who then has a minor traffic infraction can be stopped and held while you search for felony convictions. I mean, that's what it sounds like you're saying. I do not submit that as a hard and fast rule, Your Honor. I apologize if that's the impression I'm getting. So what's the key factor, then, that the car wasn't registered in his name? Because you can see whenever you pull somebody over, they'll say, like, why did you stop me? And then he looks nervous, and that's enough to run a felony check. That seems very thin to me. So is it because of the registration? That's enough to tip it over to the other side? I would say all the factors in tandem, Your Honor. I think the weightiest factor for the government was the drug house. The drug house was very substantiated. So then anyone who stops at a drug house can be pulled over and harassed? I wouldn't say harassed, Your Honor, perhaps investigated. What I would say is that Jefferson House, in the manner to let us not forget that the defendant stopped there for a mere 10 minutes, came in and out. He wasn't on Thanksgiving Day, and he stayed for three hours. But the manner in which he stopped at the time of night is also suspicious. But somebody who's evasive with law enforcement, exhibiting great nervousness, doesn't know his own address, and driving a vehicle, each isolated by themselves, Your Honor, does not equal reasonable suspicion. I agree with the court, but it's taking everything together in this unique fact pattern. Reasonable suspicion doesn't lend itself to neat and clean rules. So I'm sorry to resist you asking me if that's enough. On these facts, I say yes. On other facts, perhaps not, Your Honor. I'd need to know more about the hypothetical in which we are engaging. I notice my time is dwindling, so I'd like to turn to the next issue, if I may, which is the continuation. The trooper acted to try to confirm or dispel his reasonable suspicion by running the warrants, the probation, and the K-9. He discovers three important pieces of information for the eight minutes he's in the car. So to give you a time frame, 3 minutes and 26 with the initial step, 8 minutes out, so we're 12 minutes into the traffic stop, that he re-approaches the vehicle and speaks to the passengers. He doesn't find anything on Hoffman, so then he runs S. Chief and says, oh, goody, he's, you know, on probation, and now I know he's hanging out with a convicted felon. So probably it's a violation of his probation, so now I have a reason to stop S. Chief. Isn't that what happened? Well, we're talking about the subjective intentions of the officers when we say, oh, golly, good. What I'm trying to get the court to focus on is they did find things on Mr. Hoffman. He does have a 2008. A caution code, right? Yes, and a hostility code for violence against law enforcement officers. Is a hostility code different than a caution code? I thought it was a caution code. Is it the same thing? It is very confused in the records, Your Honor, and it's referenced at page 101 and page 88, but they kind of have some variations on terms that were used. But it's one code. He got one, not two. Speaking outside the record, my understanding for Idaho State Police was it was a caution code for violence, which I believe is just one, but that's outside the record. I was going to say, we don't really have that. Yes, and it is kind of muddy in the record, but there was an alert for some form of hostility. So he gets that from Mr. Hoffman. Now he's confronted with two things he needs to do that's reasonably related to his law enforcement, a potential probation violation in addition to the narcotics investigation, and he has to answer both. And now he does, and he addresses both investigations with reasonable diligence. He gets Mr. Ashif out of the car, and after speaking with him for two minutes, he learns that he's on probation. He also learns at 14 minutes and 14 seconds into the traffic stop that he should not be associating with felons. 14 minutes is a long time, counsel. It is, Your Honor. However, it's not necessarily the time frames. Rodriguez says we do not base these things on time frames or expectations. That was the primary holding of Rodriguez. I understand. I'm just telling you, 14 minutes is a long time. Yes. And he has sort of one thing after another in this case. It's quite an extended sequence. Yes. To justify the police officer's actions, I would reference United States v. Sharpe, in which we analyze whether or not the officer acted reasonably to confirm or dispel his suspicions. And in this case, operating alone, he pulled Mr. The officer says, I won't arrest you, he says to Mr. Ashif. Could he have arrested him for a suspected probation violation? At that time, Your Honor, and I'm speaking outside the record, and I notice my time is over, if I may respond to your question. It is the policy and procedure that they call probation and parole to verify the terms of probation to report, and then they could either say go ahead and arrest him on an issued warrant or things of that nature. So, I mean, there has to be some additional communication. So, off the record, my response to your question would be I think he has to have more communication with the on-call probation officer. Okay. I see that my time has expired. Do you, Your Honors, have any additional questions for me? No, apparently not. Thank you. Your Honors, it is a privilege I ask that you affirm the district court. Thank you for hearing. I respectfully submit. Thank you. Now, I want to focus back on the prolongations. In the court, in its decision, well, first, I want to focus on when those occurred. Those occurred, as the court noted earlier, five minutes into the stop, and they both followed. The drug, the call for the drug dog was made right after the call for the driver's records check, and then right afterwards, Trooper Edgeley embarked on the calls for the drug convictions and the probation checks. Nothing, there's no new facts that occurred between those two prolongations. Now, in the district court's decision, it focused on some factors which occurred much later in the sequence. And as the government articulates in its brief, there's really five factors that it relies upon to give rise to reasonable suspicion. And these all occurred at the outset of the traffic stop, when Trooper Edgeley makes initial contact with Mr. Hoffman and his passenger. The court cannot use anything, or the government cannot point to any of the factors that occurred much later in that traffic stop to somehow bootstrap and give rise to this reasonable suspicion because those prolongations occurred so early into this traffic stop. Okay. Thank you. Thank you. We appreciate your argument. And the case of United States v. Hoffman is submitted. And the next case, United States v. Christian Ruiz, is submitted on the briefs. And the United States v. Peters is submitted on the briefs. And United States v. John Emmett Brown is submitted on the briefs. And we'll next hear argument in Stephen Crow and Cheryl Crow v. Transystems, Inc.
judges: Ikuta, Christen, Choe-Groves